OPINION OF THE COURT
Martin Evans, J.
This novel civil rights action brought under section 1983 of title 42 of the United States Code, by a property owner against the city and employees of its rent law enforcement agency raises important questions about municipal and individual liability for failure to obey a court order.
Plaintiff corporation is the owner of a multiple dwelling in the Lincoln Center area. Joined as defendants with the City of New York are four individual defendants, sued in their official capacities, comprising the executive officer and supervising legal staff of the city’s rent control agency.
This action arises out of a dispute over the proper rental for a furnished room in plaintiff’s building. The building in question is a dilapidated rooming house. The first floor is occupied for commercial purposes; the second, third and fourth floors are residential, consisting of 26 one-room dwelling units. Since at least 1943, and continuing until the present owner acquired the property in 1973, the residential portion of the building was operated by a master lessee, one Arthur Flindell. In 1945, on the application of the then landlord, City Bank Farmers Trust Company, apparently a mortgagee in possession, the Office of Price Administration issued an order declaring that the “Rent Director * * * finds that the entire 2nd, 3rd and 4th floors are rented under an underlying lease. That more than 25 rooms are rented or offered for rent by the lessee thereof. *219 Premises are therefore exempt from the New York City Rent Regulations for Housing.”*
Neither the lessee, Flindell, nor the owner registered with the rent control authorities nor filed for increases which might have been permissible under the rent regulations. Once having filed a rooming house registration in December, 1943, Flindell operated the building informally, renting rooms on oral agreement, and periodically increasing the rent. It appears that only minimal improvements, at best, were made during this period. When plaintiff acquired title in 1973, it retained Flindell as a superintendent, who continued this unconventional form of management. Neither Flindell nor the prior or current landlord ever filed for admission of the premises to the maximum base rent system. The 1943 rooming house registration, the 1945 application, and the consequent order of exemption, appear to have been the only documents in the files of the rent control authorities until 1976.
In March, 1976, the tenant of apartment 61 filed an overcharge complaint with the city rent agency. In October, 1976, following an investigation, the rent agency initiated a proceeding to determine the maximum rent for the tenant’s room, which appeared to be subject to rent control. The tenant, who had initially paid $45 per month after having taken occupancy in 1969, was paying $71.68 per month when the proceeding commenced. In February, 1977, the rent agency, without having conducted a proper comparability survey pursuant to section 36 of the New York City Rent and Eviction Regulations, then fixed the maximum rent for the room at $34.60 per month for one person and $49.25 per month for two persons.
Plaintiff landlord initiated a “protest”, the administrative appellate proceeding provided by section Y51-8.0 of *220 the Administrative Code of the City of New York. (NY City Rent & Eviction Regs, Part IX, §§ 91-103.) Following denial of the protest, plaintiff sought judicial review pursuant to CPLR article 78 and section Y51-9.0 of the Administrative Code.
In June, 1977, this court (Fein, J.) remanded the matter to the rent agency for further consideration based on a proper comparability survey. Pursuant to Justice Fein’s order, the rent agency conducted a physical inspection of the subject premises and examined department records of several noncomparable buildings. No documentary or physical comparison was made with other comparable accommodations. The rent agency then concluded, apparently not based on any investigation, that no comparable accommodations existed elsewhere. In July, 1978, relying on the original filing, the rent agency reduced the maximum permissible rent to $32.50 per month for one person, $38.25 for two. The landlord unsuccessfully protested; following denial of the protest in May, 1979, it brought on a second article 78 proceeding. By order dated July 17,1979, this court (Hughes, J.) again remitted the matter to the rent agency and directed that it “conduct a comparability study to ascertain the rents generally prevailing in the same area for substantially similar housing accommodations”. The city neither appealed from this order, nor sought renewal.
It is undisputed that the rent agency never conducted a comparability study in compliance with Justice Hughes’ order. In October, 1979, the agency conducted a remand hearing. The hearing officer stated that the prior comparability study (that deemed inadequate by Judge Hughes), would be “taken into consideration” and that another would be ordered only “if it is deemed that another one is necessary”. Despite repeated reference to Justice Hughes’ order, plaintiff’s counsel was told by the hearing officer, “When I issue my order, you will see whether or not I agree or disagree with that”. Despite the clear wording of Justice Hughes’ order, the rent agency’s final order declared, “comparability is not always a factor in determining the maximum rent of a controlled housing accommodation * * * the Commissioner further finds that comparability *221 in the instant case may be virtually impossible because of the nature of the subject accommodation” (emphasis added). The agency again denied plaintiff’s protest. Shortly before the denial, plaintiff brought on a third article 78 proceeding, to compel a decision by the agency. The city, in the wake of the denial, took the position that the matter was moot and did not submit a formal answer. In December, 1979, in a well-considered opinion, this court (Wallace, J.) again remanded the proceeding to the rent agency, and directed, inter alia, that Justice Hughes’ order be obeyed and that a comparability study be performed. The Appellate Division vacated Justice Wallace’s order, on the grounds that the city should have been permitted to file a formal answer. The proceeding has not yet been renoticed for submission at Special Term.
In January, 1981, plaintiff instituted this action. The complaint broadly charges that the defendants maliciously conspired to deprive him of rent increases, and more generally, of his civil rights, and sought to destroy his business. It seeks injunctive relief and compensatory and punitive damages. The city, in moving for summary judgment, seeks dismissal of the complaint. First, the city claims that each of the defendants are absolutely immune from suit since the predicate for this action were acts done in the course of a quasi-judicial proceeding. Second, as to the State cause of action in prima facie tort, the city claims that plaintiff is legally incapable of proving a lack of justification — a necessary element of the claim. Third, the city claims that the plaintiff’s failure to renotice the article 78 proceeding itself renders this action either premature or groundless, or at least makes it impossible for the plaintiff to prove damages.
While the complaint does not set forth a sufficient factual basis to prove the kind of broad conspiracy which plaintiff conclusorily alleges, it does sufficiently set forth both a claim under the Federal Civil Rights Act and a State cause of action in prima facie tort.
The Federal law at issue here, section 1983 of title 42 of the United States Code, states: “Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, *222 subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.” Adopted by Congress as part of the Civil Rights Act of 1871, it does more than grant Federal jurisdiction over State actions in derogation of the rights of former slaves. Rather, it was intended to grant a broad civil right of redress to any person victimized by an abuse of State power which deprived him of a Federally secured right. (See Owen v City of Independence, 445 US 622, 635; Monell v New York City Dept. of Social Servs., 436 US 658; Butz v Economou, 438 US 478.) Although an increase in a statutorily controlled rent is not itself a Federal right, due process of law most assuredly is. Stripping away both the tangled procedural history of this case and the unsupported conclusory allegation of conspiracy, the. essence of plaintiff’s civil rights claim is that defendants repeatedly ignored the order of the court which defined plaintiff’s rights, and did not conduct a comparability study. Plaintiff’s right to collect rent is, by definition, a property right, and thus protected by the due process clause of the Fourteenth Amendment of the United States Constitution. It is this constitutional right, not merely the protest and review procedures provided by the Administrative Code, which mandate that the rent agency fairly determine applications after affording all the parties an opportunity to be heard. While the initial failure to undertake a comparability study is not necessarily itself a due process violation, the continued and deliberate refusal to undertake it, after judicial direction to do so, amounted to such a violation here. The study was directed within the context of the ongoing administrative and judicial review proceedings. The court determined that such a study was necessary if the plaintiff’s application for a rent increase was to be fairly considered; obedience to the court order was necessary if the right to judicial review was to have any meaning. The failure to introduce proper comparability data at the remand hearing made the hearing an empty formality, not the kind of full and fair opportunity to be *223 heard that due process demands. The city’s disregard of the court’s order effectively insulated itself from judicial review.
Plaintiff similarly sets forth a sufficient claim for prima facie tort. In order to prove its claim, plaintiff must prove that the defendants (1) intended to inflict, and actually did inflict, intentional harm on plaintiff; (2) which resulted in actual damages; (3) without excuse or justification; (4) by an act or acts which otherwise would have been lawful. (See Sommer v Kaufman, 59 AD2d 843.) Defendants baldly assert that the mere, conceded facts that they were “performing official functions * * * [and] were receiving compensation”, thereby supply a motive, other than malice, which would defeat plaintiff’s claimed lack of justification. Defendants beg the question. Plaintiff alleges here the unjustified failure to perform a nondiscretionary act ordered by a court. Defendants misapply, and seek to extend, the well-settled principle of governmental immunity for the performance of discretionary acts to the non-discretionary situation presented here (cf. Bernkrant v State of New York, 26 AD2d 964). To hold as defendants argue would effectively immunize functionaries in the executive branch from meaningful judicial review and would threaten the principle of the separation of powers.
Defendants also claim absolute immunity from liability under section 1983 of title 42 of the United States Code because they are engaged in “quasi-judicial” activity. Judges, prosecutors, and hearing officers who act in a quasi-judicial role have absolute immunity because they must be free to exercise their judgment impartially, free from the threat of suit by a litigant. (See Imbler v Pachtman, 424 US 409; Butz v Economou, 438 US 478, supra.) Defendants on occasion do exercise a quasi-judicial function when they enforce the rent laws; that conclusion does not itself end our inquiry. Administrative enforcement agencies, such as the city rent agency, often perform multiple functions, some but not all of which are quasi-judicial. The conduct of hearings and the prosecution of violations resemble the inherently discretionary roles of Judge and prosecutor; the performance of a nondiscretionary, ministerial task such as the factual analysis of comparable rents *224 is more analogous, even in the case of a high executive, to the function of a subordinate clerk in the executive branch. (See Socialist Workers Party v Attorney General of U. S., 458 F Supp 895.) Obedience by the agency to a court order does not require the exercise of discretion, indeed, it prevents it. The individual defendants therefore lack absolute immunity, and have only qualified immunity.
It is not clear, however, who among the individual defendants had responsibility for securing compliance with Justice Hughes’ order. That order was directed to the agency and not to any individual employee. The submissions before the court include cursory job descriptions, but are devoid of any information as to the chain of command, the procedures for assigning, supervising and reviewing work in general, and specifically of acts mandated by court order. These issues, important to the determination of which defendants are liable, are crucial in the case of defendants whose job functions, and connection to the case, are essentially supervisory. (See Salinas v Breier, 517 F Supp 1272.) Resolution of these issues, which should be explored in disclosure, must await trial.
Neither is the city absolutely immune from suit as a result of its status as a municipal corporation (Monell v New York City Dept. of Social Servs., 436 US 658, supra) nor can it assert any immunity, absolute or qualified, for its own torts, based on its reliance on the good faith of its employees. (Owen v City of Independence, 445 US 622, supra.) The city cannot be held liable for an employee’s torts solely on the basis of respondeat superior. Reading Monell (supra) and Owen (supra) together, the city is liable for an act if it is performed by the municipality or an employee pursuant to official policy. Policy can be evidenced in various ways, from legislative pronouncement (Owen) to official acquiesence in custom (Monell); it can be directed to a broad class (Monell) or to a single individual (Owen).
A policy can be inferred from any failures to act, as well as acts of supervisory personnel. (Turpin v Mailet, 619 F2d 196.) But while a single act or omission is ordinarily insufficient as proof, a single, “unusual” or “egregious” incident of illegality, may within the context of other *225 evidence in the case, “warrant an inference that it was attributable to inadequate * * * supervision amounting to deliberate indifference or ‘gross negligence’ on the part of officials in charge” {supra, at p 202). In the case at bar, plaintiff’s conclusory allegations of conspiracy are not sufficiently substantiated by evidence to warrant the granting of judgment. Although the evidence offered is flimsy indeed, it is sufficient to cause the complaint to withstand dismissal. Certainly, the cavalier disregard of the court order, and the characterization of plaintiff’s dilemma by an agency employee as “typical landlord allegations * * * presumed to be without foundation” does provide some support for believing that defendants may have been motivated by animus to plaintiff, or that the agency may show a pattern of neglect or refusal to follow the orders of the court, sufficient to warrant the conclusion that a chosen policy had been adopted and was being carried out in this case.
Finally, the plaintiff’s failure to renotice the article 78 proceeding does not require dismissal on the grounds of prematurity or incapacity to prove damages. First, it is now clear that the exhaustion of State administrative or judicial remedies is not a condition precedent to the maintenance of an action pursuant to section 1983 of title 42 of the United States Code. (See Patsy v Board of Regents of State of Fla., 457 US 496; Steffel v Thompson, 415 US 473.) Second, the law does not compel the performance of useless acts. Plaintiff, having seen the city rent agency flout one order for a comparability study, may reasonably have viewed it pointless to spend time and attorney’s fees procuring a second order which would place it in no better position. Third, although the measure and extent of damages is properly one for the trial court and is not passed upon here, it cannot be said here that plaintiff will be unable to prove damages other than its prior and current legal fees. Attorney’s fees, considerable before this complaint was brought, will be greater in an action such as this, which will require wide-ranging discovery on both liability and damage questions. Even if a citizen aggrieved by official misconduct can prove neither loss amounting to more than nominal compensatory damages, nor malice *226 sufficient for punitive damages, a civil rights action such as this properly permits him to recover attorney’s fees. The ultimate cost to the city may well be substantial, even if the city’s position on damages is vindicated.
The motion for summary judgment dismissing the complaint is accordingly denied. The city is ordered to comply with the order of Justice Hughes by conducting a proper comparability study, and by noticing the matter for a hearing and rendering a decision setting a new maximum rent within 60 days of service with a copy of this decision and order.

 This exemption, although ambiguously worded, apparently was intended to apply to the master lease between the bank and Flindell, and not to the rental by Flindell of individual rooms. The rent control statute, originally passed as Federal emergency legislation in 1942, permitted the regional administrator to grant certain exemptions. (56 US Stat 26 [Jan. 20,1942, ch 26, tit I, § 2].) The exemption granted here, apparently that for premises where over 25 rooms are rented by a lessee, is still codified in the State and city successor statutes. (L 1946, ch 274, § 2, as amd; Administrative Code of City of New York, § Y51-3.0, subd e, pars 1, 2.)